**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **XIANG YUAN, et al.** | : | **CIVIL ACTION** |
| | : | |
| | : | |
| **v.** | : | **NO. 24-2363** |
| | : | |
| **STANLEY BLACK & DECKER, INC., et al.** | : | |
| | : | |
| | : | |

**MEMORANDUM OPINION**

**Henry, J.** **August 17, 2026**

Pending before the Court are Defendants' Motion for Summary Judgment (ECF No. 22) and Motion to Exclude Michael Zazula (ECF No. 21). This case arises out of damage to Plaintiffs' real and personal property after a riding lawnmower in their garage ignited in flames. Plaintiffs bring claims for strict liability (Count I); negligence (Count II); breach of express warranties (Count III); and breach of implied warranties of fitness for a particular purposes and merchantability (Count IV).

For the following reasons, I will grant both Motions.

## I. BACKGROUND

The undisputed facts of the case are as follows: The subject product at issue is a Cub Cadet LTX1040 riding lawnmower, manufactured by Defendant MTD Products Inc. ("MTD") some time between November 2009 and April 2011. ECF No. 23 (Defendants' Statement of Proposed Undisputed Material Facts in Support of Motion for Summary Judgment) ¶¶ 1-2. The lawnmower was powered by a 19-horsepower single-cylinder Kohler engine, which had its exhaust system located at the front of the machine below the hood. *Id.* ¶ 5. It was designed such that exhaust gases were diverted from the engine first through tubing and into a muffler canister, then through a small

opening on the cannister wall into a circular-shaped deflector that was screwed into the cannister wall, and finally through a port extension opening. *Id.* ¶ 6. This caused gases to be exhausted out and away from the muffler assembly. *Id.*

As part of the design process for this particular model of lawnmower, MTD and the engine manufacturer subjected the engine system to extensive testing. *Id.* ¶ 7. Such testing included computer simulations, field testing, dynamometer testing, 4-post shaker table testing, ladder testing, figure 8 track testing, hot surface testing, grass browning testing, sound testing, and heat testing. *Id.* ¶¶ 7-8. If any of the testing revealed issues, MTD would develop and incorporate design changes, and then subject that updated design to further testing. *Id.* ¶ 9. During the manufacturing process, MTD's riding lawnmower models went through an end of line test by which lawnmowers were pulled off of the assembly line at random and tested according to MTD's quality audit procedures. *Id.* ¶ 10.

In or around 2010, Plaintiff Xiang Yuan ("Dr. Yuan") purchased the subject lawnmower from Lowe's. *Id.* ¶ 4. At that time, MTD provided certain warnings and instructions via on-product labeling, an operator's manual, and an engine manual. *Id.* ¶ 11. The operator's manual provided the following warnings and instructions:

- "Read, understand and follow all instructions on the machine and in the manual(s) before attempting to assemble and operate."
- "Do not attempt to mow through unusually tall, dry grass . . . or piles of dry leaves," as these "may contact the engine exhaust and/or build up on the mower deck presenting a potential fire hazard."
- "To reduce fire hazards, keep machine free of grass, leaves, or other debris build- up. Clean up oil or fuel spillage and remove any fuel soaked debris."
- "Allow a machine to cool at least five minutes before storing."

- "[T]his product has an *Average Useful Life* of seven (7) years, or 270 hours of operation. At the end of the *Average Useful Life* have the machine inspected annually by an authorized service dealer to ensure that all mechanical and safety systems are working properly and not worn excessively. Failure to do so can result in accidents, injuries, or death."

*Id.* ¶ 12. The operator's manual further provided a maintenance schedule, instructing users to clean the hood/dash louvers every 10 hours and prior to storing and to clean engine cooling fins every 25 hours and prior to storing. *Id.* ¶ 13.

On or about June 12, 2022, Dr. Yuan operated the subject lawnmower and, without letting it cool off for the recommended five minutes, moved it into his garage. *Id.* ¶¶ 3, 21. The lawnmower caught fire while parked inside Plaintiffs' garage. *Id.* ¶ 3. As of that date, the port extension in the engine was missing, and Dr. Yuan had not had the lawnmower serviced in over two years, nor had he ever lifted the hood to clean any accumulated debris in the cooling fins and engine area. *Id.* ¶¶ 18, 24. A failure to clean the cooling fins or the engine can result in clogging that reduces the flow of cooling air in the engine area, and when debris accumulates in the engine area, it can become dry and more combustible over time. *Id.*¶¶ 19-20. A clogged air intake can result in an overheated engine. *Id.* ¶ 23.

Plaintiffs brought suit in the Court of Common Pleas of Philadelphia County, Pennsylvania on May 9, 2024 against Defendants MTD and Stanley Black & Decker ("SBD"). Defendants removed the case to federal court on May 31, 2024 on the basis of diversity and filed their Answer on June 7, 2024. *See* ECF Nos. 1, 5. The case was reassigned to me on January 9, 2025. *See* ECF No. 16. Following discovery, Defendants filed their Motion for Summary Judgment (ECF No. 22) ("Mot. Summ. Judg.") and Motion to Exclude Michael Zazula (ECF No. 21) ("Mot. Excl.") on September 29, 2025. Plaintiffs opposed the Motions on October 23, 2025, *see* ECF No. 26 ("Opp.

to Mot. Summ. Judg."); ECF No. 27 ("Opp. to Mot. Excl."), and Defendants filed their joint reply brief on November 14, 2025, *see* ECF No. 29 ("Reply").

On January 27, 2026, Defendants filed a Notice of Supplemental Authority, placing the Court on notice of a similar action against the same Defendants in the Eastern District of Pennsylvania before The Honorable Magistrate Judge Craig M. Straw, *George v. Stanley Black & Decker, Inc., et al.*, No. 24-cv-2035. *See* ECF No. 30. In that case, the Honorable Magistrate Judge Straw granted Defendants' Motion to Exclude Michael Zazula and Motion for Summary Judgment. *See George v. Stanley Black & Decker, Inc.*, 817 F. Supp. 3d 277 (E.D. Pa. 2026). Plaintiffs filed a response to Defendants' Notice of Supplemental Authority on February 10, 2026. *See* ECF No. 31.

## II. LEGAL STANDARD

Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if proof of its existence or non-existence might affect the outcome of the suit, and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). The Court draws all inferences in favor of the nonmoving party. *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 357 (3d Cir. 2004).

## III. ANALYSIS

Plaintiffs bring causes of action for strict liability (Count I), negligence (Count II), breach of express warranties (Count III), and breach of implied warranties of fitness for a particular

purposes and merchantability (Count IV) against both MTD and SBD.[1] They allege defects in the lawnmower's design, manufacture, and warnings.

**a. Motion to Exclude Expert Testimony of Michael Zazula**

Plaintiffs seek to present the testimony of Michael Zazula as evidence about the fire's causation and defects in design, manufacture, and warnings. Defendants ask the Court to deem his testimony inadmissible because he is not qualified as an expert and his opinions are unreliable. I agree with Defendants as to Zazula's lack of qualification as an expert in lawnmower manufacturing, design, and warning defects and the unreliability of his opinions on fire causation. Therefore, I will grant Defendants' Motion to Exclude Zazula.

**i. Standard of Law**

The admissibility of expert opinions is governed by Federal Rule of Evidence 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> >
> > (b) the testimony is based on sufficient facts or data;
> >
> > (c) the testimony is the product of reliable principles and methods; and
> >
> > (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. The District Court acts as a "gatekeeper" in determining whether expert testimony is relevant and reliable. *Kannankeril v. Terminix Int'l, Inc.,* 128 F.3d 802, 806 (3d Cir.

[1] The parties do not dispute that Defendant SBD was not involved in the design, manufacture, assembly, maintenance, advertisement, sale, distribution, or servicing of the subject lawnmower. *See* Mot. Summ. Judg. at 17; Opp. to Mot. Summ. Judg. at 19. SBD seems to be involved only because it acquired MTD's parent company in 2021. Mot. Summ. Judg. at 17. There are no genuine issues of material fact as to SBD's involvement, so summary judgment is granted in favor of SBD on all claims. Thus, the only remaining claims are against MTD.

1997). In so acting, the Court has three duties: "(1) confirm the witness is a qualified expert; (2) check the proposed testimony is reliable and relates to matters requiring scientific, technical, or specialized knowledge; and (3) ensure the expert's testimony is 'sufficiently tied to the facts of the case,' so that it 'fits' the dispute and will assist the trier of fact." *UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*, 949 F.3d 825, 832 (3d Cir. 2020) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591 (1993)).

A proposed expert is required to "possess specialized expertise." *Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008) (quoting *Schneider ex rel. Est. of Schneider v. Fried,* 320 F.3d 396, 404 (3d Cir. 2003)). This standard is interpreted liberally; "a broad range of knowledge, skills, and training qualify an expert as such." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir. 1994).

The reliability requirement turns on whether the expert's testimony is "based on the methods and procedures of science, not on subjective belief and unsupported speculation." *UGI Sunbury LLC*, 949 F.3d at 833-34 (quoting *Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61, 80-81 (3d Cir. 2017)). The expert's testimony must be supported by "good grounds," which Courts determine by looking to a number of factors, including:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*Id.* at 834 (quoting *Pineda*, 520 F.3d at 247-48).

Whether an expert's testimony "fits" the case depends on whether it "will help the trier of fact to understand the evidence or to determine a fact in issue." *Id.* at 835 (quoting Fed. R. Evid. 702(a)).

### ii. Summary of Zazula's Opinion

Plaintiffs rely on Zazula's expert testimony to show that "a gap that developed over time between the muffler and the exhaust deflector on the lawn tractor caused hot gases to be misdirected, toward the inside of the machine instead of outside, causing combustion and the subject fire." Opp. to Mot. Excl. at 2.

Zazula's report states that following the incident with Dr. Yuan's lawnmower, he "was requested to participate in a scene and evidence inspection/examination of the subject tractor to determine the cause of the tractor fire" and "to determine if a malfunction or defect in the tractor caused or contributed to this fire." *See* ECF No. 21-5 ("Zazula Report") at 3. The methodology used in his investigation is the scientific method as outlined in the National Fire Protection Association ("NFPA") 921 Guide for Fire and Explosive Investigations. *Id.* at 5.

In detailing the subject lawnmower that he examined following the fire, he noted that its muffler was missing the deflector extender, and without the deflector extender, "the exhaust gases do not properly exit away from the muffler/muffler guard." *Id.* at 11. He also found an "outward deformation/bulging of the muffler," *id.* at 14, submitting that "[t]he deformation of the deflector from the muffler and the lack of the deflector extender . . . impacts the proper exhaust flow through the deflector and allows hot exhaust gases to escape and impinge on components/debris within the engine area," *id.* at 17.

Zazula performed testing on an exemplar Cub Cadet lawnmower of a different model, with the difference between the models being the horsepower rating and cutting decks. *Id.* at 26. He ran the engine on the lawnmower over a ten-minute period, recording data in ten-second intervals from five probes attached to the tractor engine and exhaust stream. *Id.* at 32. He recorded temperatures that he concluded were "high enough/in excess of- to ignite leaking oil from the valve cover gasket,

which was observed on the exemplar tractor muffler and grass/debris in/around the exhaust componentry." *Id.* at 35.

He noted that he had "inspected or been involved with inspecting in excess of 50 MTD LTX/LT tractor fires throughout 20 years of forensic investigations" and that "[a] common and consistent occurrence/observation is the . . . muffler outward deformation and separation or gap between the muffler and deflector." *Id.* at 37.

Zazula ultimately concluded that the subject lawnmower's muffler was deformed due to backfiring, which caused the deflector shield to deform away from the muffler, that the gap formed between the muffler and the deflector allowed hot exhaust gases to impinge upon combustible material including plastic, grass, oil, and other materials, that temperatures of the exhaust gases and exhaust componentry exceeded the ignition temperature of debris, grass, and oil, and that hot exhaust gases and excessive heat impinged upon the plastic engine shroud, valve cover, valve cover gasket, and any accumulated oil, grass, and debris within the area of the muffler, causing the fire. *Id.* at 39. He opined that the fire would not have occurred if the deflector had not deformed away from the front of the muffler or if the deflector extender were present, as the hot exhaust gases would have been directed out and away from the engine and ancillary components. *Id.* at 39.

At his deposition, Zazula testified that he had never designed an engine that was mass produced. ECF No. 21-9 ("Zazula Dep.") 40:13-15. When confronted with the question of whether he had an opinion about an alternative design for the engine of the subject lawnmower, he responded that "the design would be for the muffler not to deform," although he did not design such an alternative engine. *Id.* 45:5-46:16. He testified that the subject lawnmower's muffler was not deformed at the time it was manufactured. *Id.* 46:17-22.

He did not subject a lawnmower with clogged cooling fins to testing, nor did he consider potentially clogged cooling fins in his opinion. *Id.* 79:8-16; 81:1-9; 83:23-84:6. He testified that

he had tested a machine where there was no gap between the muffler and the deflector approximately ten years ago, although he did not discuss the results of that test. *Id.* 156:18-159:4.

**iii. Zazula's Opinion on Fire Causation**

Defendants argue that Zazula's opinion on fire causation must be excluded because it is unreliable, first on the grounds that he "selectively ignored evidence and eschewed a first fuel analysis," and second, because he "failed to follow the scientific method and test his hypothesis." Mot. Excl. at 17, 19.

As to the "first fuel analysis," Defendants submit that Zazula "undertook no analysis of first fuel(s) that may have started the ignition chain" and failed to consider that combustible materials in front of or below the lawnmower may have been the first fuel. Mot. Excl. at 18. Rather, Defendants say, Zazula relied on Plaintiffs' fire origin expert, Robert Buckley, who apparently told Zazula that the first fuel was "debris or something on the tractor" in "the area of the muffler." *Id.* But at his deposition, Buckley testified that he did not know exactly where on the lawnmower the fire started. *Id.* (quoting Buckley Dep. at 37:11-38:1). Thus, Defendants conclude, Zazula violated the NFPA 921's guidelines by rendering a fire origin-and-cause determination despite failing to analyze all collected data, such as the potential existence of other combustible materials around the lawnmower and the fact that Dr. Yuan testified that he added oil to the mower prior to using it on the day of the fire. *Id.* at 19.

Plaintiffs do not specifically respond to Defendants' first fuel analysis argument, instead positing generally that "the process of ruling out potential ignition sources *is* testing according to the scientific method and all [that] is required under NFPA 921, and in turn Rule 702." Opp. to Mot. Excl. at 10 (emphasis in original).

Zazula's report as to ignition source relies on Dr. Yuan's deposition testimony that when he saw the fire, it was in the area of the lawnmower's engine, and Mr. Buckley's report, which

stated in relevant part that "[t]he only competent ignition source found in the origin area was the Cub Cadet riding mower." Zazula Report at 3-4. He proceeds to conclude that "[a]s the deflector/muffler was found with the gap(s), hot exhaust gases and excessive heat impinged upon the plastic engine shroud, valve cover, valve cover gasket and *any accumulated oil, grass and debris within the area of the muffler*, resulting/causing the fire." Zazula Report at 39 (emphasis added).

It cannot be said that Mr. Zazula's conclusion as to the source of ignition was anything beyond mere speculation. It is true that "the District Court is not to weigh the evidence relied upon or determine whether it agrees with the conclusions reached therein" but rather, "the role of the District Court is simply to evaluate whether the *methodology* utilized by the expert is reliable, i.e., whether, when correctly employed, that methodology leads to testimony helpful to the trier in fact." *See Walker v. Gordon*, 46 F. App'x 691, 695 (3d Cir. 2002) (emphasis in original). But "the expert's opinion must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation.'" *State Farm Fire & Cas. Co. v. Holmes Prods.*, 165 F. App'x 182, 186 (3d Cir. 2006) (quoting *In re Paoli R.R. Yard PCB Litig.,* 35 F.3d at 742).

Here, Zazula does not specifically address other potential first fuels in his report, such as potential combustibles in front of or below the lawnmower. Although an expert is not required to definitively rule out all other possible causes of a fire, they should still "provide *some* explanation for ruling out plausible alternative causes as the sole cause of the incident." See *State Farm & Cas. Co. v. IDC Mgmt. Co.*, No. 18-cv-01282, 2019 WL 5537844, at *3 (M.D. Pa. Oct. 25, 2019) (citing *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 156 (3d Cir. 1999)). Here, Zazula's explanation for ruling out alternative causes is his reliance on Mr. Buckley's opinion that the first fuel must have been "debris or something on the tractor" in "the area of the muffler" because the lawnmower was not "parked up against something that would be a combustible that would be ignited by the

exhaust system on the tractor." Mot. Excl. at 18 (quoting Zazula Dep. at 63:12-65:3). In this Court's opinion, Zazula has not excluded other first fuels reliably, as he only refers to another individual's opinion that the lawnmower was not parked up against something combustible. This does not address potential combustibles underneath the mower, nor does Zazula use his own methodology to reach such a conclusion, making his opinion as to the ignition source unreliable.

However, even if Zazula's first fuel analysis was considered reliable, I would still exclude his testimony as to fire causation based on Defendants' second raised grounds for exclusion: failure to test his hypothesis. Defendants argue that Zazula's methodology failed to follow the scientific method as outlined in NFPA 921 because he did not test his hypothesis. Mot. Excl. at 19. The NFPA's definition of the scientific method is "[t]he systematic pursuit of knowledge involving the recognition and definition of a problem; the collection of data through observation and experimentation; analysis of the data; the formulation, evaluation and testing of a hypothesis; and, when possible, the selection of a final hypothesis." Zazula Report at 5.

Zazula's primary theory is that the distention of the muffler resulted in a gap between the muffler wall and deflector, which allowed hot gases to escape through the gap and ignite combustible materials in the lawnmower's engine area. Defendants posit that this theory is "amenable to testing" by measuring and comparing the temperatures reached in the engine area of two different lawnmowers: one where there is no gap between the cannister and deflector and where the port extension is present, and one where there is a gap between the cannister and deflector and/or the port extension is removed. Mot. Excl. at 9-10. Zazula did not conduct such a test, instead testing only one exemplar lawnmower—which did not necessarily exhibit the alleged defects at issue in this case—and finding that it exhibited temperatures high enough to ignite combustible materials. The Court agrees with Defendants that Zazula's testing cannot be said to prove his theory that the gap in the cannister and/or the missing port extension was the *cause* of

the increased temperatures which ignited any combustible materials. I echo the holding of my colleague in *George*: "Mr. Zazula could have fully tested his hypothesis, but he chose not to. . . . Thus, his one-sided opinion without additional testing he could have performed is not reliable." 817 F. Supp. 3d at 291.[2]

Defendants further look to the eight factors set forth by the Third Circuit to determine whether an expert's testimony is supported by "good grounds." Most importantly, Defendants emphasize that Zazula's method *does* "consist[] of a testable hypothesis," which he failed to actually test, and that NFPA 921 provides a set of "standards and controls for fire investigations," which Zazula failed to adhere to. *See* Mot. Excl. at 21; *see also UGI Sunbury LLC*, 949 F.3d at 834 (setting forth factors the Court may consider in determining whether an expert's opinion has "good grounds"). In opposition, Plaintiffs argue that the NFPA 921, although a reliable methodology, "is not meant to be a rigid book of rules." Opp. to Mot. Excl. at 8. They further baldly claim that Zazula's "reliability, including his methodology and technique avoid subjective belief and unsupported speculation" before restating the details of Zazula's test. *Id.* at 9. But Plaintiffs in no way refute Defendants' arguments that Zazula's opinion as to fire causation is unreliable, rather just nakedly asserting that Zazula's test was "[c]onsistent with the scientific method outlined in NFPA 921." *Id.* at 10. Plaintiffs in no way show that Mr. Zazula's conclusions are anything beyond mere speculation, so his opinion as to fire causation is inadmissible.

**iv. Zazula's Opinion on Defective Condition**

Defendants next argue that Zazula's opinion on the defective condition of the subject lawnmower must be excluded because he is not qualified and his opinion is not reliable.

[2] Notably, Mr. Zazula testified in the present case that the testing relied on (and later excluded) in *George* is the same testing presented in this case. He did not complete the tests a second time for this case. Zazula Dep. 15:20-16:9.

Defendants contend that Zazula is not qualified to opine as to any defect in the lawnmower's design, manufacture, or warnings because he "lacks the specialized expertise that would be needed to aid the jury in understanding evidence on the separate issues of lawnmower design, engine design, materials science, production processes, product quality control, human factors, ergonomics, and product warning psychology." Mot. Excl. at 22. In response, Plaintiffs state merely that "there are no specific educational requirement [sic] for experts" and that "Zazula has extensive experience as a mechanical consultant, inter alia, and education in the fields in which he offers opinions, and has testified in many Federal and State matters." Opp. to Mot. Excl. at 8-9.

Zazula is not an engineer. Plaintiffs are correct in pointing out that there is no specific educational requirement to qualify an individual as a witness. *See, e.g.*, *VanDine v. Summit Treestands, LLC*, 738 F. Supp. 3d 599, 610 (E.D. Pa. 2024) ("The basis of specialized knowledge 'can be practical experience as well as academic training and credentials,' and 'at a minimum, a proffered expert witness . . . must possess skill or knowledge greater than the average layman.'") (quoting *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000)). But Plaintiffs provide no specifics as to why Zazula *is* qualified to testify as to defects in lawnmower design, manufacture, or warnings.

Zazula specifically testified that he was not a warnings expert, so the Court will not further consider his qualifications in that field. Zazula Dep. 59:10-11. He additionally testified that he had never designed a mass-produced engine, *id.* 40:13-15; he had not designed a muffler for the type of lawnmower at issue in this case, *id.* 45:12-17; and he had never designed a lawnmower or engine exhaust system for a lawnmower, *id.* 117:18-24. Plaintiffs' contention that Zazula has "extensive experience as a mechanical consultant," *see* Opp. to Mot. Excl. at 8, does not overcome these deficiencies to show that Zazula "posses[es] specialized expertise" in lawnmower design or

manufacture, *see Pineda*, 520 F.3d at 244. I again echo my colleague in the factually similar *George* case in holding that "any of Mr. Zazula's testimony regarding the lawnmower's purported defects should not be considered." 817 F. Supp. 3d at 292.

Even if Zazula were qualified to opine on design or manufacturing defect, his opinion is not reliable. As to any defect in design, Zazula testified that a feasible alternative design would be one in which the muffler did not deform. He did not provide any details as to what such a design would entail, nor did he provide any other evidence of a design defect beyond the fact that the muffler was apparently capable of deforming. *See* Zazula Dep. 45:5-47:18. And as to defect in manufacture, Zazula was unable to identify anything in the lawnmower's assembly that caused the muffler to deform. *Id.* 174:11-12. As Defendants point out, Zazula merely offers the "observation of the altered operating condition of a 12-year old lawnmower that, in his view, might hasten the occurrence of a fire in the engine area," which "is not a design defect," but merely "the symptom of a hypothetical design defect." Mot. Excl. at 24. Without any supporting methodology or scientific procedure to support his opinion on defect, his opinion cannot be considered anything beyond subjective belief. Therefore, Zazula's opinion as to the defective condition of the lawnmower's design, manufacture, or warnings is not admissible.

Defendants' Motion to Exclude Michael Zazula is thus granted in full.[3]

**b. Motion for Summary Judgment**

Having determined that Zazula's testimony is inadmissible, the Court is now faced with Defendants' Motion for Summary Judgment. In their Complaint, Plaintiffs assert claims of strict

---

[3] Because "[a] court is not required to hold a *Daubert* hearing, even if it is requested, if the record allows the court to rule on admissibility," *United States v. Xue*, 597 F. Supp. 3d 759, 770 (E.D. Pa. 2022), and the record before the Court now is sufficient for me to decide admissibility, any request for a *Daubert* hearing by the parties is denied.

liability, negligence, and breaches of express and implied warranties. Defendants move for summary judgment on all of Plaintiffs' claims.

**i. Strict Liability/Breach of Implied Warranties**

Under Pennsylvania law, a strict products liability claim requires the plaintiff to show "(1) that the product was defective, (2) that the defect existed when it left the hands of the defendant, and (3) that the defect caused the harm." *Riley v. Warren Mfg., Inc.*, 688 A.2d 221, 224 (Pa. Super. Ct. 1997). "A 'defective condition' can be established by showing that a product suffered from a design defect, failure-to-warn, or manufacturing defect." *Keen v. C.R. Bard, Inc.*, 480 F. Supp. 3d 624, 634 (E.D. Pa. 2020) (citing Restatement (Second) of Torts § 402A).

Plaintiffs also allege breach of the implied warranties of merchantability and fitness for a particular purpose. "To establish a breach of either warranty, plaintiffs must show that the equipment they purchased from defendant was defective." *Varner v. MHS, Ltd.*, 2 F. Supp. 3d 584, 596 (M.D. Pa. 2014). Because the breach of implied warranty claims share defectiveness in common with Plaintiffs' strict liability claims, the Court will discuss those causes of action concurrently.

Plaintiffs have not shown that there are any genuine issues of material fact as to any of the three types of defects, so summary judgment is granted to Defendants on Plaintiffs' strict liability and breach of implied warranty claims.

**1. Design Defect**

A plaintiff can prove a design defect by showing "either that (1) the danger is unknowable and unacceptable to the average or ordinary consumer (the consumer expectations test), or (2) a reasonable person would conclude that the probability and seriousness of harm caused by the product outweigh the burden or costs of taking precautions (the risk-utility test)." *Wright v. Ryobi Techs., Inc.*, 175 F. Supp. 3d 439, 450 (E.D. Pa. 2016).

Here, the Court has already excluded Plaintiffs' proposed expert testimony from Zazula as to design defect. *See* Section III.a.iv, *supra*. Absent Zazula's testimony, Plaintiffs have not provided evidence to create a genuine issue of material fact as to whether the lawnmower contained any design defect. Plaintiffs purport to rely on both the "consumer expectations test" and the "risk-utility test" to demonstrate that there is a genuine dispute of fact as to design defect. *See* Opp. to Mot. Summ. Judg. at 5. But the "consumer expectations test" does not apply to cases where, as here, "the fire hazard posed by the . . . alleged defective design is beyond the everyday understanding of the ordinary consumer." *Parvez & Razia Yazdani v. BMW of N. Am., LLC*, 188 F. Supp. 3d 486, 493 (E.D. Pa. 2016), *dismissed sub nom. Yazdani v. BMW of N. Am. LLC*, No. 16-3149, 2016 WL 11987495 (3d Cir. Oct. 20, 2016); *see also George*, 817 F. Supp. 3d at 295 ("An average consumer does not understand the inner workings of the exhaust system of the lawnmower or how a small gap might affect the temperature in the engine.").

As for the "risk-utility test," the Court considers factors such as

> (1) the product's usefulness and desirability, (2) its safety aspects, (3) the availability of a substitute product which would meet the same need and not be as unsafe, (4) the manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility, (5) the user's ability to avoid danger by exercising care when using the product, (6) the user's anticipated awareness of the dangers inherent in the product either because of general public knowledge of the obvious condition of the product, or because of the existence of suitable warnings and instructions, and (7) the feasibility of spreading the loss by setting the price of the product or carrying liability insurance.

*Wright*, 175 F. Supp. 3d at 451. Plaintiffs merely maintain that they "will present expert testimony to establish that a feasible, safer alternative design existed and that, if used, the safer design would have prevented the product from bursting into flames suddenly and without warning, as occurred in this case," Opp. to Mot. Summ. Judg. at 15-16, and that "Defendant could have manufactured a product that does not carry any risk of deforming over time with normal and foreseeable use of the

product," *id.* at 18. But such conclusory statements are insufficient to create a genuine dispute of material fact—Plaintiffs' proposed expert has been excluded and, regardless, Plaintiffs have not indicated what such a safer design might be or how one might manufacture the lawnmower at issue without a risk of deforming. As such, Plaintiffs cannot survive summary judgment on a design defect theory.

**2. Manufacturing Defect**

"[A] manufacturing defect claim is essentially a claim 'that something went awry in the manufacturing process . . . [and] the finder of fact need only compare the product that caused the injury with other products that were manufactured according to specifications." *Chandler v. L'Oreal USA, Inc.*, 340 F. Supp. 3d 551, 564 (W.D. Pa. 2018), *aff'd*, 774 F. App'x 752 (3d Cir. 2019) (internal quotations omitted). "A manufacturing defect can be established by direct evidence of a breakdown in the machine or a component thereof or by circumstantial evidence of a product malfunction as long as Plaintiff rules out abnormal use or secondary causes of the injury." *Id.* (internal quotations omitted).

Again, absent Zazula's opinion testimony, Plaintiffs have presented no evidence of a manufacturing defect. Instead, Plaintiffs seek to rely on the "malfunction theory" of manufacturing defect. To succeed pursuant to the "malfunction theory," a plaintiff must "provide evidence of a malfunction along with evidence ruling out abnormal use or reasonable secondary causes of the malfunction." *Chandler*, 340 F.Supp.3d at 565. Plaintiffs contend that they "will demonstrate that the product was never altered, was used for its intended purpose and in a foreseeable manner, failed suddenly, catastrophically and without warning and burst into flames without notice, and that all reasonable, secondary causes of the product's malfunction have been eliminated, and that the product caused more than $840,000 in property damage as a result." Opp. to Mot. Excl. at 14. But Plaintiffs do not point to what that purported evidence is, nor do they cite to anything in the record

to support such a broad statement. Without more, Plaintiffs cannot create a genuine dispute of material fact as to whether the subject lawnmower suffered from a manufacturing defect.

**3. Failure-to-Warn**

To succeed on a strict liability failure to warn claim, "a plaintiff must show that the absence or inadequacy of warnings was the factual and proximate cause of the injury." *Chandler*, 340 F. Supp. 3d at 562. Plaintiffs submit that they "shall present evidence that the product left the defendants' control lacking relevant safety warnings concerning deformation of the muffler, the development of a gap in the exhaust system, or to have the unit serviced in the event of back fires or after fires." Opp. to Mot. Excl. at 18. But having already excluded Zazula's testimony as to the sufficiency of Defendants' warnings, and absent any other evidence that the warnings provided were inadequate and therefore the proximate cause of the injury, there is no genuine dispute of material fact as to Plaintiffs' failure to warn theory as a basis for their strict liability and breach of implied warranty claims.

**ii. Negligence**

Plaintiffs next assert claims of negligence in manufacturing and design.[4] "To prevail in a negligence action, a plaintiff must show that the defendant had a duty to conform to a certain standard of conduct, that the defendant breached that duty, that such breach caused the injury in question, and actual loss or damage." *Keen*, 480 F. Supp. 3d at 637 (internal quotations omitted). In order to raise a genuine issue of material fact as to whether Defendants breached their duty owed to Plaintiffs, Plaintiffs must offer evidence "that the Defendant failed to exercise due care in

[4] Although the Complaint alleges negligence in "designing, manufacturing, assembling, testing, inspecting, marketing, branding, distributing, selling and placing into the stream of commerce the subject lawn mower," *see* Compl. at ¶ 42, the only theories discussed in the briefing by both parties are negligent design and negligent manufacturing. The Court will therefore proceed discussing only those theories the parties have advanced in briefing. *See Pastore v. Bell Tel. Co. of Pennsylvania*, 24 F.3d 508, 511 (3d Cir. 1994) ("The non-moving party cannot rely upon conclusory allegations in its pleadings or in memoranda and briefs to establish a genuine issue of material fact.")

manufacturing or supplying the product." *Soufflas v. Zimmer, Inc.*, 474 F. Supp. 2d 737, 754 (E.D. Pa. 2007). Plaintiffs have not done this. Without Zazula's testimony, Plaintiffs have offered no evidence that Defendants' design or manufacture of the subject lawnmower "fell below the general standard of care expected under the circumstances." *Id.* Summary judgment is thus granted in Defendant's favor on Plaintiffs' negligence claims.

**iii. Breach of Express Warranty**

In their Complaint, Plaintiffs allege that Defendants breached an express warranty "that the subject lawn mower was compliant with applicable product safety standards." Compl. ¶ 48. Neither party further addresses breach of any express warranty in their summary judgment briefings, and the Court may grant summary judgment as to that claim on that ground alone. *See Carroll v. Lancaster Cnty.*, 301 F. Supp. 3d 486, 499-500 (E.D. Pa. 2018) (collecting cases).

Even considering the merits of the breach of express warranty claim, Defendants are entitled to summary judgment on it. Plaintiffs have not shown any genuine dispute of material fact as to the existence of an express warranty. Under Pennsylvania law:

> (1) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.
>
> (2) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.
>
> (3) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

*Fike v. Glob. Pharma Healthcare Priv., Ltd.*, 741 F. Supp. 3d 265, 272-73 (E.D. Pa. 2024) *Id.* at 272-73 (quoting 13 Pa. C.S.A. § 2313(a)). Plaintiffs have not presented evidence of any such affirmation of fact or promise, description of the goods, or sample or model so as to prove the existence of any such express warranty. And "[w]ithout an express warranty there cannot be a

breach of express warranty." *Id.* at 278. Therefore, summary judgment is warranted in favor of Defendants on Plaintiffs' breach of express warranty claim.

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motion to Exclude Michael Zazula and Motion for Summary Judgment are granted. An appropriate Order follows.